UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MICHAEL HALE, JR.,                          )
                                            )
            Plaintiff,                      )
                                            )
     vs.                                    )     Case No. 4:12CV01490 AGF
                                            )
WHOLE FOODS MARKET GROUP, INC., )
                                            )
            Defendant.                      )

## <u>MEMORANDUM AND ORDER</u>

This employment discrimination action is before the Court on Defendant's motion for summary judgment. Plaintiff Michael Hale, Jr., an African-American, filed suit against his former employer, Whole Foods Market Group, Inc. ("Whole Foods"), claiming racial discrimination, harassment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*., and the Missouri Human Rights Act ("MHRA"), Mo. Rev. Stat. § 213.010, *et seq*. For the reasons set forth below, Defendant's motion for summary judgment shall be granted on all claims.

## <u>BACKGROUND</u>

Viewing the facts in the light most favorable to Plaintiff, the record establishes the following. Plaintiff was employed as a member of the Grocery Team at Defendant's store in Town & Country, Missouri, from June 2008 until his termination in November 2010. He began working on June 9, 2008, at a wage of $9.00 per hour. His direct supervisor when he began was the store's Grocery Team Leader Jerret Hotle. Defendant

conducts a performance review, called a Job Dialogue, to evaluate each team member at least once a year. As part of the Job Dialogue, the employee completes a self-evaluation of his or her performance in various categories. The employee's supervisor then assesses the employee in the same categories and discusses that evaluation with the employee at a one-on-one meeting. The annual Job Dialogue coincides with awarding raises.

On June 3, 2009, Hotle conducted a Job Dialogue with Plaintiff. Out of 60 possible points, Plaintiff gave himself a score of 54 points and Hotle gave Plaintiff a score of 47 points. Plaintiff testified that he did not believe that the manner of Hotle's evaluation was discriminatory; however, following that Job Dialogue, Plaintiff received a raise of 3 percent, or $ .27 per hour, which he did believe was discriminatory. (Pl.'s depo., Doc. No. 99-1 at 18.) Plaintiff testified that Hotle explained to him that the maximum possible raise was 3 percent, but Plaintiff believed a fair raise would have been between $ .50 and $ .75. Plaintiff further testified that he spoke to two white team members, Shannon Rice and Justin Whitmore, and they told him that they received raises higher than 3 percent. Plaintiff did not know what score they received on their Job Dialogues or the amount of their raises.

Plaintiff testified that he told the Store Team Leader, Matt Mel, that he believed his raise was discriminatory, and that Mel responded that Hotle "misunderstood how raises were issued out" and that a "3 percent raise is only reserved for salary employees." Plaintiff did not tell Mel what he believed a fair raise would be, and Mel did not suggest what raise Hotle should have awarded Plaintiff. *Id*. at 20-22. Shortly thereafter, on July

2

15, 2009, Plaintiff received a pay raise of $ .23 per hour, bringing his hourly wage up to $9.50. The reason for the change was documented as a "market adjustment." (Doc. No. 114-2 at 26.) Plaintiff testified that when Hotle advised him of the increase, Hotle apologized for misunderstanding the 3 percent rule, and said that he had spoken with Mel. (Doc. No. 99-1 at 22.) After his pay was increased to $9.50, Plaintiff no longer felt that his pay was discriminatory. *Id.*

On December 13, 2009, Hotle asked Plaintiff to distribute samples of rice to customers in the store. Plaintiff was concerned that the rice was not sanitary and brought his concerns to Hotle's attention. According to a Situation Summary of the incident, Hotle was not completely aware of the state of the product, as he was upstairs, and directed Plaintiff to serve it anyway. Plaintiff refused and was sent home, ending his shift early that day, resulting in loss of pay for the remainder of the day. (Doc. No. 114-2 at 22-23.) Plaintiff acknowledged that he was sent home for "insubordination" and "refusing to follow instructions" by failing to distribute the rice samples, however, he testified that he was treated in a discriminatory way because white employees were not forced to end their shift early for refusing to follow instructions. The only specific instance Plaintiff could provide was that Dan Lake, a white employee, was not sent home when he refused to follow a supervisor's "specific instructions on cleaning" and called the supervisor a "bitch." Plaintiff did not know what discipline, if any, was issued to Lake for his insubordination. (Doc. No. 99-1 at 27.)

Believing that his punishment had been discriminatory, Plaintiff called

Defendant's employee tip line and he also spoke to Mel about his concerns.  Mel told Plaintiff that he would investigate the matter, and Plaintiff assumed Mel did so because, according to Plaintiff, "the situation was resolved."  *Id.*

The next time Plaintiff felt he was discriminated against by Defendant involved "the James Schmidt situation."  In March 2010, at Defendant's "Galleria" store, located approximately 11 miles away from the store at which Plaintiff worked, James Schmidt, a white employee, was told that an African-American co-worker was adopting a vegan diet. In response, Schmidt told a white co-worker, Nate Speak, "[a]ll black people want for dinner is chicken and watermelon."  *Id.* at 29.  Neither the African-American Galleria employee nor Plaintiff personally heard the comment.  Speak told Plaintiff about Schmidt's statement and Plaintiff advised Speak to report the comment and "take it through the proper channels of leadership."  Plaintiff testified that Speak agreed to do so, but Plaintiff was unaware of whether or not he did.  *Id.* at 30.

Plaintiff testified that on another occasion, Schmidt said "[t]he way you avoid having children by a black woman is you pull out."  *Id.*  Again, this statement was made at the Galleria store and Plaintiff did not hear the comment, but learned of it from a Galleria employee.  Plaintiff testified that he considered the statement "as a death threat. That's saying that kids shouldn't be born.  They shouldn't exist."  *Id.* at 31. Plaintiff further testified that Schmidt, angered that team members had reported the two above incidents, said, "I'm tired of you men complaining like these women like your coochy is hurting."  *Id.* at 32.  Plaintiff was not present for this comment either, but heard

of it through a Galleria employee. Plaintiff believed the comment was "an insult to everyone's mother," and he found the comment to be "[v]ery insulting." *Id.*

Plaintiff reported Schmidt's three comments to Mindy James, a human resources representative for Defendant. He testified that James told him later that she had relayed the report to Defendant's Regional Team Member Services Coordinator, Heather Sulic, who promised to investigate. Plaintiff also met with Michael Bashaw, Mid-West Regional President of Whole Foods, about his racial discrimination and harassment concerns. Plaintiff did not know what discipline, if any, was issued to Schmidt as a result of Schmidt's comments. Plaintiff was also unaware of whether or not Schmidt held a supervisory position at the time that he made his comments. *Id*. at 29-35.

Sulic attested that Brian Gourley, Store Leader at the Galleria store, investigated Schmidt's comments and reported back to her, whereupon she concluded that Schmidt's statements, "while offensive, were not made maliciously." (Sulic Aff., Doc. No. 99-2 at 33.) Gourley and Sulic decided Schmidt would be demoted, transferred to a different shift, and placed on final warning. Plaintiff submitted the affidavit of another employee that Gourley told him, regarding complaints against Schmidt, that Gourley did not believe what was said about Schmidt and that Schmidt was "not racist because he listens to rap music." (Doc. No. 114-6 at 1.)

Plaintiff testified that, as a result of Schmidt's comments, it was harder for him to do his work at the Town &Country store "[b]ecause [it was] a constant reminder of how

black men can't get justice" and it "[kept] him from being 100 percent." (Doc. No. 99-1 at 39.)

On July 5, 2010, Plaintiff sent an email to Defendant's Global Human Resources Support Specialist John Morgan asserting that team members were deceived by the store's leadership regarding the amount of pay increases that were available; African-American men and women were not considered for employment by the Town & Country store; minorities were excluded from interview panels; female supervisors were not paid at the same rate as male supervisors; supervisors were not disciplined after instances of business abuse were reported; a supervisor allowed his friend to transfer to the Town & Country store when the friend was in danger of being terminated at another location; Team Leaders gave "speed tests" to team members in order to deny raises and promotions; Team Leaders used intimidation tactics to make team members fear reporting wrongdoing; team members were "pre-trained" for promotions before the positions were posted; the tip line for reporting misconduct did not work; team members were not given equal opportunities for vacation days; team members were advised that they spent too much time with customers; Team Leaders were permitted to alter their schedules; Team Leaders decided who received an attendance point for being late or absent; and team members were denied opportunities to transfer to other teams.

Plaintiff acknowledged that he was not subjected to many of the complaints that he identified in this email. Specifically, he testified that he was not subjected to discriminatory hiring; was not administered a "speed test"; was not subjected to

intimidation tactics to make him fear reporting infractions; was not denied training opportunities to prepare for promotions; did not experience any instances in which the tip line did not work; and did not receive unfair treatment regarding his schedule or the allocation of attendance points.

With respect to other matters raised in the email to Morgan, Plaintiff testified that a request he made to serve on an interview panel for selection of a new Store Team Leader was denied, but he did not know who served on the panel and whether minorities did.  He testified that on one occasion, the paperwork that he submitted to request vacation time was lost, but he did not know if this was intentional or if any other team members had their vacation requests disregarded or misplaced.  And he testified that a request he made for a lateral transfer to a Bakery Team was denied, but he did not know who was hired to fill that position.

On September 5, 2010, Plaintiff had a Job Dialogue with Grocery Team Leader Alex Hanna (an African-American) and Associate Team Leader Jason Nosser.  The scoring for the Job Dialogue had changed, but the process remained the same.  Plaintiff assessed himself 15 points out of a possible 21, which placed him in the category of "consistently meets standards."  (Doc. No. 114-1 at 4-10.)  Plaintiff was awarded 12 points categorizing him as "needs improvement meeting standards."  *Id.*  Plaintiff did not think that any portion of the Job Dialogue assessment was discriminatory.  (Doc. No. 99-1 at 60.)  However, in connection with this Job Dialogue, Plaintiff received a raise of $ .30 per hour, which he did believe was discriminatory; he believed a raise of $1.50 per

hour would have been fair. *Id.*

As Plaintiff acknowledged, according to Defendant's Midwest Regional Wage Administration Guidelines ("Wage Guidelines"), a Job Dialogue score for team members between 8 and 13 qualified for a recommended raise of $ .25 per hour; a score between 14 and 17 qualified for a recommended raise of up to $ .50 per hour; and a score between 18 and 21, qualified for a recommended raise of up to $1.00 per hour. (Doc. No. 114-1 at 12.) Plaintiff testified that Michael Bashaw (Midwest Regional President) told him raises were a matter of a Team Leader's discretion. He testified that "white team members were getting dollars and $ .75 [raises]," but he acknowledged that he did not know his co-workers' Job Dialogue scores or the amounts of their raises. (Doc. No. 99-1 at 61.)

One of Plaintiff's white co-team members at the time of his 2010 September Job Dialogue was Kathryn Cook. In August/September 2010, Cook received a Job Dialogue score of 17, "exceeds standards," and a raise of $ .65 per hour ($ .15 more than the raise recommended by the Wage Guidelines). In June 2010, another white co-team member, Justin Whitmore, received a Job Dialogue score of 14, categorizing him as "consistently meets standards," and his raise was $ .40 per hour ($.10 less that the maximum recommended by the Wage Guidelines). And in July 2010, grocery buyer Ryan Mattingly, who was also white, received a Job Dialogue score of 17 and was awarded a $ .75 per hour raise ($.25 more than the raise recommended by the Wage Guidelines).

On September 12, 2010, Plaintiff made a tip line complaint about his raise. At a meeting with James and the Town & Country Store Leader Shannon Chronister shortly

thereafter, Plaintiff was presented with a list of goals that would result in a larger salary increase. Plaintiff testified that he did not believe that some of the goals, such as "increase task speed," and "improve communication skills with leadership," were fair. *Id*. at 64.

On September 21, 2010, Plaintiff filed a Charge of Discrimination with the Missouri Commission on Human Rights and the Equal Employment Opportunity Commission ("EEOC") claiming racial discrimination and retaliation based on (1) Schmidt's comments and the allegation that no action was taken in response to Plaintiff's complaint about them; (2) not hearing back from Morgan or Bashaw in response to Plaintiff's July 2010 email; (3) being sent home early on July 30, 2010, due to budget constraints while a higher-paid white worker was allowed to stay; and (4) receiving a "poor performance rating" from Chronister in September 2010 and a low raise based on the rating, and not having his concerns that this was discriminatory and retaliatory addressed by Chronister or James. (Doc. No. 114-1 at 17-18.)

On October 8, 2010, Defendant introduced a checklist form at the Town & Country store to assign team members work and for team members to check off tasks they completed. Previously, the employees' tasks were delegated by writing them out on a board. Under the new system, the team members received a piece of paper at the beginning of a shift indicating what each team member was supposed to do. Team members were also directed to indicate on the sheet what tasks they had done. The new system was modified on October 16 and October 31, but generally all versions involved a

piece of paper with each team member's tasks for that shift and a place for them to indicate performance of a task. Plaintiff's job duties remained the same; the only thing that changed was the way in which those duties and responsibilities were assigned, and the way employees indicated that they had done assigned tasks. (Doc. No. 99-1 at 68-69.)

Plaintiff testified that he believed the new system was a way to target him for termination because it was introduced so soon after he filed his EEOC charge. Plaintiff testified that the October 31 version of the checklist form "gave multiple instructions" because at the top it said employees should check off the completed tasks and at the bottom it said they should initial the form, and that he was not trained on how to use the form. *Id.*

On November 1, 2010, Plaintiff worked on restocking the frozen section and the bulk foods section of the Grocery Department, but he did not in any way indicate on the checklist form the work he had done. The next day, Hanna asked Plaintiff why he did not check off that he had done the bulk and frozen work. Hanna told Plaintiff that he spent 20 minutes working the bulk back stock because Plaintiff had not marked it as completed. Plaintiff testified that he told Hanna he did not check the form because he had not completed the tasks. Additionally, Plaintiff testified that he objected to Hanna asking him to "sign" the form and despite Hanna's request, Plaintiff did not sign or initial it. (Doc. No. 99-1 at 72.)

On November 3, 2010, Chronister questioned Plaintiff about his refusal to sign the

10

checklist form on the previous day and asked him whether or not he was going to sign it. Plaintiff refused to sign the form and stated that he was going to call his attorney. Chronister testified that Plaintiff told him that he believed the checklist was a way to target team members to fire, and refused to sign the form despite Chronister asking him to do so three times. Chronister testified that he did not know at the time that Petitioner had filed a charge with the EEOC. He believed Plaintiff was being insubordinate and contacted Defendant's regional human resources office about the matter. (Doc. No. 99-2 at 114.) Chronister suspended Plaintiff, and by letter dated November 8, 2014, Chronister terminated Plaintiff from employment for the stated reason of his insubordination in refusing to sign the checklist. The letter stated: "This incident is but one example of your apparent frustration with your job leading to a poor attitude and an inability to take direction from your team leaders." (Doc. No. 114-1 at 19.) Chronister testified that neither race nor Plaintiff's filing of the EEOC charge were taken into consideration in the decision to fire him. (Doc. No. 99-2 at 102.)

Plaintiff testified that he objected to "signing his full name" because that was "like signing a contract." (Doc. 99-1 at 74.) Plaintiff did not object to initialing the form because "initialing is just like saying, Hey, Michael Hale did this." He testified that the only reason he did not sign the form as directed was because he was asked to sign his full name and not just his initials. Plaintiff testified that he would have been willing to initial the form, but he admitted that he never communicated that to Chronister. *Id.* at 75.

Plaintiff asserts in his memorandum in opposition to Defendant's motion for

summary judgment that on November 18, 2010, the Town & Country store discontinued use of the checklist form. (Doc. No. 114 at 12). However, he presents no basis for this assertion and none exists in the record. Plaintiff testified that white employees were not terminated for violating Defendant's policies. Specifically, he noted that Whitmore had received six points for absences, but was not terminated, despite Defendant's policy of termination for six absence points.

Plaintiff submits the affidavit of Hanna attesting that Hanna believed that Chronister "had a personal vendetta against [Plaintiff] based on a previous incident between Jarret Holte and Shannon Chronister," and that he (Holte) believed that "through Jake Flacs' [sic][1] influence, a hostile work environment existed from May 2010 to November 2010." (Doc. No. 114-3 at 15.)

**Plaintiff's Complaint**

Plaintiff filed his three-count complaint on August 20, 2012. Count I is for racial discrimination, Count II is for racial harassment (hostile work environment), and Count III is for retaliation. In Count I, Plaintiff asserts that Defendant established a "pattern and practice of racial discrimination against Plaintiff and other African-Americans, in that [Defendant's] African-American employees were not afforded the same opportunities for advances and pay increases as their non-African-American counterparts." (Doc. No. 2.) The complaint lists as the facts supporting this claim the July 5, 2010 email Plaintiff sent

---

[1] Jacob Flachs was an Associate Store Team Leader, first at the Galleria store and then from approximately May 2010 until he was terminated in July 2012, at the Town & Country Store. (Doc. No. 114 at 18-19.)

to Morgan and Plaintiff's not hearing back about it. Count II is based on the allegation that Defendant refused to address the matter of Schmidt's racial comments and refused to discipline Schmidt, thereby creating a hostile work environment for Plaintiff and other African-American employees. And Count III asserts that Plaintiff was terminated in retaliation for filing the EEOC charge.

## ARGUMENTS OF THE PARTIES

### Defendant's Arguments

Defendant argues that it is entitled to summary judgment on all of Plaintiff's claims. Defendant first argues that a claim of discrimination with respect to Plaintiff's June 2009 raise fails because Plaintiff testified that he had no personal knowledge of the amount of any other team members' raises at that time, and thus his testimony that other team members received larger raises is based on inadmissible hearsay. Defendant notes that Plaintiff testified that once his raise was increased to $.50 per hour one month later, he did not feel the total increase was discriminatory. Defendant also argues that this claim fails due to Plaintiff's failure to exhaust it in a timely fashion, as his EEOC charge was filed more than 15 months after this alleged act of discrimination and did not mention it.

With respect to Plaintiff's September 2010 pay raise, Defendant argues that Plaintiff failed to produce any admissible evidence that white team members received raises of $.75 and $1.00 per hour, and failed to show that his raise of $.30 per hour was less than that of any similarly-situated white employees. Defendant points to the

evidence that Cook, Mattingly, and Whitmore received higher Job Dialogue scores than Plaintiff, and argues that they were therefore not similarly situated to him. Defendant contends that the evidence shows that Plaintiff's raise was awarded in a legitimate, nondiscriminatory manner, based on his Job Dialogue score, which Plaintiff testified he did not believe was discriminatory, and Defendant's Wage Guidelines.

With respect to the December 2009 rice sample incident, Defendant argues that Plaintiff's reliance on Lake as a white employee who acted insubordinately but did not have to leave early is unavailing because Plaintiff presented no evidence from which to infer that Lake's and Plaintiff's infractions were comparable, or that Lake's punishment was less severe.

Defendant argues that it is entitled to summary judgment on Plaintiff's claim of racial harassment / hostile work environment arising out of Schmidt's comments, because Schmidt's offensive comments were made at a different store and thus did not create a hostile work environment in Plaintiff's workplace. Plaintiff did not work with Schmidt at the time that the statements were made or any time thereafter; Plaintiff was not present when the statements were made, and the statements were not made about, or directed to, Plaintiff; nor were the comments physically threatening. Defendant further asserts that the undisputed record establishes that Defendant took prompt action once it learned of the offensive comments and that its discipline of Schmidt successfully ended racially offensive comments by him.

Additionally, Defendant argues that Plaintiff cannot establish that he was subject

to a hostile work environment at the Town & Country store based on the numerous other allegations of mistreatment of employees that he mentioned in his July 5, 2010 email to Morgan, as Plaintiff was not subjected to a majority of the situations, many of them were not based on race, and those that were based on race, such as being denied the opportunity to be on an interview panel and being denied a lateral transfer, taken separately or together, did not establish that that Plaintiff was subjected to a severe and pervasive racially hostile work environment that altered the terms and conditions of his employment.

With regard to Plaintiff's retaliation claim, Defendant argues that summary judgment in its favor is appropriate because Plaintiff was fired for refusing his supervisor's direct orders to comply with the checklist procedure, which was a legitimate nonretaliatory reason for termination. Defendant argues that Plaintiff relies exclusively on the temporal proximity of his EEOC charge and his termination to support his claim of retaliation, and that this is not sufficient to establish that the proffered reason for his termination – insubordination – was prextual.

**Plaintiff's Arguments**

Plaintiff maintains that there are issues of material fact precluding summary judgment. With respect to his discrimination claim, Plaintiff does not address the June 2009 pay raise or the December 2009 incident of his shift ending early due to his refusal to put out rice samples. With respect to the September 2010 pay raise, he relies on his assertion that this raise was the lowest of his three fellow full-time team members, who

were all white.  Plaintiff argues that Defendant's reasons for awarding Plaintiff a lower raise are pretextual, as Defendants did not follow the Wage Guidelines by giving Cook and Mattingly $ .15 and $ .25, respectively, in excess of the Wage Guidelines recommendation for their scores.  Additionally, Plaintiff argues that Defendant's use of the Wage Guidelines is pretextual because Whitmore received a higher raise than Plaintiff, even though Whitmore should have been terminated for attendance issues.

Plaintiff argues that the fact that Whitmore was not terminated based on his absence points is evidence that Defendant "treated the African-American employee differently than a similarly-situated Caucasian employee.  The African-American employee was terminated for a minor offense, while a Caucasian employee was retained even though according to [Defendant's] own policy, he should have been terminated." (Doc. No. 114 at 26.)

In support of his claim of racial harassment, Plaintiff argues that Schmidt's comments created a hostile environment at both Defendant's Galleria and Town & Country stores because the managerial structure made the two locations one work environment.  Plaintiff further argues that Defendant's managers were ill-equipped to handle a diverse population and that the two stores "good ole' boys network" consisting of Gourley, Chronister, Schmidt, and Flachs resulted in a culture of "cronyism and intolerance" that made racist and sexist comments acceptable.  (Doc. No. 114 at 34-36.)

Plaintiff also brings in allegations that the demographics of Defendant's employees at the Town & Country store did not mirror the racial composition of

metropolitan St. Louis and that African-Americans are generally underrepresented in Defendant's organization.

In opposition to summary judgment on his retaliation claim, Plaintiff relies on the temporal proximity between his EEOC filing and his termination. Additionally Plaintiff argues that Defendant's proffered reason for termination was pretextual. Plaintiff points to Hanna's affidavit that Hanna believed Chronister had a personal vendetta against Plaintiff. Plaintiff also argues that he was fired without cause, believing that he should not have been terminated for refusing to sign off on work that he had not completed. He asserts that Defendant's decision to implement the checklist form in the first place was pretextual and a way to target him for termination. To support this assertion, Plaintiff alleges that the system was discontinued ten days after his termination. Plaintiff points to Defendant's sending him home early due to the 2009 incident of insubordination in refusing to pass out the rice samples as an example of a more appropriate disciplinary action that Defendant should have taken, rather than terminating him.

**Defendant's Reply**

In reply, Defendant argues that Plaintiff has waived his claims of discrimination based on the June 2009 raise and December 2009 rice sample incident, as well as his MHRA retaliation claim, by not addressing these claims in response to the motion for summary judgment.

# DISCUSSION

## Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56(c) of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The court must not weigh evidence or make credibility determinations; the moving party bears the burden of showing the absence of a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The court must view the record "in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor." *Chambers v. Pennycook*, 641 F.3d 898, 904 (8th Cir. 2011).

When a motion for summary judgment is made and properly supported by evidence, the non-moving party may not rest on the allegations of his pleadings but must set forth specific facts, by affidavit or other evidence, showing that there is "a genuine issue for trial." Fed. R. Civ. P. 56(e). "To establish a genuine issue of material fact, [a plaintiff] may not merely point to unsupported self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in

her favor." *Fatemi v. White*, ___ F.3d ___, 2015 WL 64308, at *16 (8th Cir. Jan. 6. 2015) (citation omitted).

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." *Celotex*, 477 U.S. at 327 (citation omitted). Although employment discrimination cases often rely on inferences, "summary judgment is not disfavored and is designed for every action . . . . There is no discrimination case exception to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc) (citation omitted).

## Title VII Claims

Title VII requires that before a plaintiff can bring a suit in court claiming unlawful discrimination or retaliation, he must file a timely charge with the EEOC or the appropriate state or local agency. 42 U.S.C. § 2000e–5(e)(1); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109-10 (2002). "In Missouri, this obligation must be discharged within 300 days of the [adverse employment action]." *Brooks v. Midwest Heart Group*, 655 F.3d 796, 800 (8th Cir. 2011). "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act." *Morgan*, 536 U.S. at 113.

### (a) <u>Discriminatory Treatment</u>

Title VII prohibits employment discrimination based on race. Unequal pay raises constitute adverse employment actions. *Hutchins v. Int'l Bhd. of Teamsters*, 177 F.3d 1076, 1082 (8th Cir. 1999). Because there is no direct evidence that Plaintiff's challenged pay raises by Defendant were based on his race, the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to these claims. *See Ebersole v. Novo Nordisk, Inc.*, 758 F.3d 917, 924 (8th Cir. 2014). Under this framework, the plaintiff must first establish a prima facie case by showing that "(1) he is a member of a protected class, (2) he met his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination." *Pye v. Nu Aire, Inc*., 641 F.3d 1011, 1019 (8th Cir. 2011). "The required prima facie showing is a flexible evidentiary standard, and a plaintiff can satisfy the fourth part of the prima facie case in a variety of ways, such as by showing more-favorable treatment of similarly-situated employees who are not in the protected class, or biased comments by a decisionmaker." *Id*. (citation omitted). For employees to be considered similarly-situated for purposes of the fourth element, the comparators must be "similarly situated in all relevant respects." *Chappell v. Bilco Co*., 675 F.3d 1110, 1118-19 (8th Cir. 2012).

If the plaintiff establishes a prima facie case of discrimination, the burden of production shifts to the defendant, who must rebut the presumption of discrimination with evidence of a legitimate, non-retaliatory reason for the challenged action. *Fatemi*,

2015 WL 64308, at *16.  "The employer's responsibility to present proof of a non-discriminatory, legitimate justification for its action is not an onerous task."  *Ebersole*, 758 F.3d at 925.  Even if the employer meets that burden, the employee may still prevail by proffering evidence that the employer's reason was a pretext for discrimination.  *Id.*

"Proof of pretext requires more substantial evidence than a *prima facie* case because unlike evidence establishing a prima facie case, evidence of pretext and retaliation is viewed in light of the employer's justification."  *Gibson v. Geithner*, ___ F.3d ___, 2015 WL 134941, at *4 (8th Cir. Jan. 9, 2015).  "There are at least two routes for demonstrating a material question of fact as to pretext: first, a plaintiff may succeed indirectly by showing the proffered explanation has no basis in fact; or, second, a plaintiff can directly persuade the court that a prohibited reason more likely motivated the employer."  *Id.*  A plaintiff may show pretext, by, among other ways, "showing that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision."  *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010).  An employee can also carry the burden of showing pretext by showing that the employer's justification for the adverse action was "unworthy of credence."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (citation omitted).

Here, the Court agrees with Defendant that Plaintiff's 2009 pay raise cannot form the basis of a racial discrimination claim under Title VII.  First, as Defendant argues, this discrete act was not mentioned in the EEOC charge, a charge filed over 15 months after

the incident. In addition, there is no indication that $ .23 per hour raise for the one month before it was changed to $ .50 per hour, with which Plaintiff was satisfied, was the result of anything but a mistake on Hotle's part.

The Court concludes that the September 2010 pay raise also does not support a claim of discrimination. Plaintiff has failed to provide evidence of a similarly-situated non-African-American employee who received a higher raise. Cook, Mattingly, and Whitmore received higher raises than Plaintiff, however, they are not similarly situated to him because they earned higher Job Dialogue scores than did Plaintiff. As noted above, Plaintiff does not assert that the scoring was discriminatory. Plaintiff does not point to any non-African-American employee who received a Job Dialogue score equal to or within the same range as him, but who received a higher raise.

Moreover, Defendants have offered a legitimate, nondiscriminatory basis for Plaintiff's raise. Namely, Defendant followed a set of Wage Guidelines based on Job Dialogue scores to help it determine the appropriate amount for each employee's raise. Plaintiff does not believe that his 2010 Job Dialogue score was discriminatory, only that his raise was. Under Defendant's Wage Guidelines, Plaintiff's score of 12 points qualified him for a recommended raise of up to $ .25 per hour. Defendant awarded Plaintiff $ .30 per hour.

Plaintiff believes that reliance on the Wage Guidelines is a pretextual explanation because white employees Cook and Mattingly were awarded raises of $ .15 and $.25 per hour more than the recommended raise, whereas Plaintiff only received $ .05 more than

the recommended raise for his range.  But again, he has not shown that these two individuals were similarly situated – for one thing, they were each closer to the high end of their Job Dialogue score range than was Plaintiff.

In sum, Plaintiff failed to demonstrate a triable issue of fact which would establish Defendant's stated reason for not providing Plaintiff a higher pay raise in September 2010 was a pretext for discrimination.

Plaintiff states in both his deposition and statement of material facts that the December 2010 rice sample incident was discriminatory because he was punished more harshly than white employees.  While Plaintiff does not raise this incident directly in his memorandum opposing summary judgment, because it is in his statement of material facts the Court will address it briefly.  Plaintiff suffered an adverse employment action when he was sent home early for, in his words, "insubordination" and "refusing to follow instructions."  However, again, he cannot point to a similarly-situated non-African-American employee who was treated differently for insubordination of a similar nature.  Plaintiff testified in his deposition that Lake, a white employee, was not sent home for refusing to follow instructions to clean.  However, Plaintiff did not witness the situation with Lake, and did not know what, if any, punishment Lake received.  Consequently, Lake is an inappropriate comparator for the purposes of proving that Defendant's proffered reason for sending Plaintiff home early that day – insubordination – was a pretext for discrimination.  Moreover, in claiming that his termination was retaliatory and an inappropriate discipline for not signing the checklist form, Plaintiff points to the

discipline for the rice incident as appropriate. The Court believes that this weakens any claim that the discipline for the rice incident was discriminatory.

Of course, the most severe adverse employment action Plaintiff sustained was termination. Plaintiff, however, challenged his termination only as being retaliatory, not that it was based on racial discrimination. This retaliation claim will be addressed below.

**(b) Harassment / Hostile Work Environment**

To prevail on a harassment / hostile work environment claim, a plaintiff must prove that (1) plaintiff was a member of a protected group; (2) plaintiff was subjected to unwelcome protected group harassment; (3) plaintiff's membership in a protected group was a contributing factor in the harassment; (4) a term, condition, or privilege of plaintiff's employment was affected by the harassment; and (5) the employer knew or should have known of the harassment and failed to take appropriate action. *LeGrand v. Area Res. for Cmty. & Human Servs.*, 394 F.3d 1098, 1101 (8th Cir. 2005).

Courts consider the totality of the circumstances in determining whether a work environment is hostile. The harasser's "conduct must be extreme and not merely rude or unpleasant." *Id.* "More than a few isolated incidents are required, and the alleged harassment must be so intimidating, offensive, or hostile that it poisoned the work environment." *Id.* "[T]he inquiry requires a consideration of the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The court may

also consider the physical proximity to the harasser, and the presence or absence of other people." *Watson v. CEVA Logistics U.S., Inc*., 619 F.3d 936, 942-43 (8th Cir. 2010) (citations omitted). Courts should remain "cognizant of the fact that a work environment is shaped by the accumulation of abusive conduct, and the resulting harm cannot be measured by carving it into a series of discrete incidents." *Id*. at 943.

Here, Plaintiff failed to establish the threshold of actionable harm necessary to constitute a hostile work environment. Accepting Plaintiff's version of the facts, the comments in question made by Schmidt, while inappropriate and offensive, were sporadic, non-threatening comments by a non-supervisor, and were not made directly to Plaintiff or even in his presence. *See Pye*, 641 F.3d at 1018-19 (concluding that an employer's payroll administrator's comment to the African-American plaintiff that his employment verification form related to housing assistance was "dumb," along with her use of a racial slur when she was not aware that the plaintiff could hear her did not create a hostile work environment in violation of Title VII); *Singletary v. Mo. Dep't of Corr*., 423 F.3d 886, 893 (8th Cir. 2005) (concluding that the fact that the plaintiff learned second-hand that co-workers and supervisors had referred to him as a "nigger" several times was insufficient to support a hostile work environment claim); *Bainbridge v. Loffredo Gardens, Inc*., 378 F.3d 756, 759-60 (8th Cir. 2004) (concluding that racial slurs that were "sporadic, no more than one per month," over a period of two years, some of which were "merely overheard" by the employee, were not so severe or pervasive to alter the terms or conditions of his employment); *cf. Delph v. Dr. Pepper Bottling Co. of*

*Paragould, Inc.*, 130 F.3d 349, 352, 356 (8th Cir. 1997) (upholding a hostile work environment claim where the plaintiff had been subjected to "a steady barrage of racial name-calling"). Moreover, Plaintiff has presented no evidence suggesting that Schmidt was not properly disciplined for the comments in question.

### (c) **Retaliation**[2]

Title VII prohibits employers from retaliating against employees for opposing racial discrimination. 42 U.S.C. § 2000e–3(a). Because Plaintiff lacks direct evidence of retaliation, the burden-shifting analysis of *McDonnell Douglas* applies. *See Musolf v. J.C. Penney Co*., 773 F.3d 916, 2014 WL 6845105, at *2 (8th Cir. 2014). In such a case, "to survive a motion for summary judgment, [a plaintiff] must show a prima facie case of retaliation and must show the proffered legitimate non-retaliatory reasons for his termination were pretextual." *Gibson*, 2015 WL 134941, at *3. Plaintiff must first establish a *prima facie* case by showing that (1) he engaged in protected conduct; (2) a reasonable employee would have found the retaliatory action materially adverse; and (3) the materially adverse action was causally linked to the protected conduct. *Id*.

The Supreme Court recently held that unlike other Title VII claims, a plaintiff

---

[2] The Court notes that under *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), Plaintiff was required to exhaust this claim separately. The exhaustion of administrative remedies, however, is not a jurisdictional requirement, but like a statute of limitations, is subject to waiver, estoppel, and equitable tolling. *Ballard v. Rubin*, 284 F.3d 957, 964 n.6 (8th Cir. 2002). Further, the defendant has the burden of proving the affirmative defense of failure to exhaust administrative remedies. *Id*. Here, although in its answer, Defendant raised the affirmative defense of failure to exhaust, it did not pursue this defense in its motion for summary judgment.

alleging retaliation "must [prove the claims] according to traditional principles of but-for causation, not the lessened [motivating factor] causation test . . . ."  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013).  Courts assign varying weight to the temporal proximity between the complaint of discrimination and the adverse action. "Proximity alone can be enough to establish causation for a prima facie case.  However, proximity alone is insufficient to establish pretext."  *Gibson*, 2015 WL 134941, at *5 (citations omitted).  Rather, a court must "evaluate the timing of the discharge in light of other evidence, or lack of other evidence, in the record."  *Id*. (citation omitted).

Here, assuming Plaintiff met his burden of establishing a *prima facie* case of retaliation, the record before the Court shows no evidence, other than temporal proximity, that would support a finding of pretext.  Plaintiff does not challenge the facts as to his failure to indicate on the checklist form on November 1, 2010, what work he had done, and his refusal to sign it the next day after being asked by his supervisor several times to do so.[3]  The record is devoid of any evidence that the checklist form was introduced to target Plaintiff for discipline.  Insubordination and violation of company policy are legitimate reasons for termination, and in assessing a claim of retaliation courts may not second-guess employers' business decisions for terminating an employee.  *Robinson v. Am. Red Cross*, 753 F.3d 749, 754 (8th Cir. 2014).  Plaintiff has not presented evidence of similarly-situated white employees who were not fired, that the decision to fire

---

[3]    Nor does Plaintiff deny that the rice incident was an earlier instance of insubordination.

Plaintiff was in contravention of Defendant's policies, or that Defendant shifted its explanation of the termination decision. Nor can the Court say that, under the circumstances here, Defendant's explanation – the insubordination exhibited by Plaintiff in refusing Chronister's repeated requests to sign the checklist form – is "unworthy of credence." Therefore, the close timeframe between Plaintiff's protected conduct and his termination is insufficient to show pretext. In sum, Plaintiff has failed to show that a material question of fact remains as to pretext, and Defendant is entitled to summary judgment on this claim. *See Gibson*, 2015 WL 134941, at *5.[4]

### (d) Pattern or Practice of Discrimination

Although not set out as a separate claim, Plaintiff's complaint does allege that Defendant engaged in a pattern or practice of discrimination by not affording African-American employees the same opportunities for advances and pay increases as other employees.[5] This claim is not pursued by Plaintiff. Rather, in his materials in opposition to Defendant's motion for summary judgment, Plaintiff attempts to establish a pattern or practice claim with allegations that Defendant's Town & Country store did not mirror

---

[4] To the extent the record can be read to assert a claim that Plaintiff was discharged on the basis of race, the above analysis would defeat such a claim as well.

[5] Although the Eighth Circuit has not ruled on the exhaustion requirement for pattern or practice claims, various district courts have barred plaintiffs from pursing a pattern or practice claim in court when such a claim was not alleged in the administrative charge. *See, e.g., Young v. Time Warner Cable Capital, L.P.*, 443 F. Supp. 2d 1109 (W.D. Mo. 2006). Here, while Plaintiff's administrative charge deals primarily with allegations of discrimination occurring to Plaintiff himself, giving the charge an expansive reading, a claim for pattern or practice discrimination is included in the allegations in the charge.

the racial demographics of the St. Louis metropolitan area, and that African-Americans are underrepresented in Defendant's organization as a whole. He asserts that the population of metropolitan St. Louis, Missouri, is 19 percent African-American, whereas only 6 percent of Defendant's employees were African-American.

The Court first notes that "[a] party may not amend a complaint in a response to a motion for summary judgment." *Taft v. Palmer*, 586 F. App'x. 251, 252 n.2 (8th Cir. 2014). Moreover, even considering Plaintiff's late allegations, they fail to survive summary judgment. When a plaintiff alleges a "systemwide pattern or practice of resistance to the full enjoyment of Title VII rights, the [plaintiff] ultimately [has] to prove more than the mere occurrence of isolated or accidental or sporadic discriminatory acts." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977). Rather, the plaintiff must "establish by a preponderance of the evidence that racial discrimination was the company's standard operating procedure – the regular rather than the unusual." *Brazemore v. Friday*, 478 U.S. 385, 400 (1986). The plaintiff need not prove such discrimination "with scientific certainly; rather, his or her burden is to prove discrimination by a preponderance of the evidence." *Id.*

Here, Plaintiff cites to a chart that includes the names, hiring, and termination dates of employees of Defendant but does not include the race of the employees and does not support an assertion that 6 percent of Defendant's employees in the Metropolitan St. Louis area were African-American. Moreover, those broad statistics, even if proven, do not establish racial discrimination because they are not based on the available labor force.

The premise of a discrimination claim based on underrepresentation of a protected group is that "nondiscriminatory employment practices will, over time, result in a workforce whose composition approximates that of the available labor force . . . ." *E.E.O.C. v. Shell Oil Co.*, 466 U.S. 54, 71 n.25 (1984). Nor does Plaintiff identify categories of work positions from which African-Americans are unequally excluded. *See id.* at 73.

## Claims under the MHRA

Although the standards for claims under Title VII and the MHRA are similar, Plaintiff's claims under the MHRA are governed by the state statute, not by Title VII. The Missouri Supreme Court has determined that the MHRA may offer greater discrimination protection than that available under federal standards. *See Daugherty v. City of Maryland Heights*, 231 S.W.3d 814, 818-19 (Mo. 2007). Missouri courts thus no longer apply the *McDonnell Douglas* burden shifting analysis, instead applying a standard derived from Missouri's approved pattern jury instructions pursuant to which an MHRA discrimination claim survives summary judgment, "if there is a genuine issue of material fact as to whether [the protected characteristic] was a 'contributing factor' in [the defendant's employment] decision." *Id.* at 820; *see also Hill v. Ford Motor Co.*, 277 S.W.3d 659, 664-65 (Mo. 2009); *McCullough v. Commerce Bank*, 349 S.W.3d 389, 397-98 (Mo. Ct. App. 2011). A "contributing" factor has been defined as one "that contributed a share in anything or has a part in producing the effect." *Williams v. Trans States Airlines, Inc.*, 281 S.W.3d 854, 867 (Mo. Ct. App. 2009). As with a claim under Title VII, a claimant under the MHRA must exhaust administrative remedies by timely

filing an administrative complaint. *See, e.g., Moschetto v. Boeing Aerospace Operations, Inc*., No. 4:14CV1042 RLW, 2014 WL 5320277, at *3 (E.D. Mo. Oct. 17, 2014).

To prevail on a harassment / hostile work environment claim under the MHRA, a plaintiff must prove (1) he is a member of a protected group, (2) he was subjected to unwelcome sexual harassment, (3) his race was a contributing factor in the harassment, and (4) a term, condition or privilege of his employment was affected by the harassment. Hill, 277 S.W.3d at 666. Where the alleged harasser was a co-worker, the plaintiff must also show that "the employer knew or should have known of the harassment and failed to take prompt and effective remedial action." *Id*. at n.6. To meet the fourth element of a hostile work environment claim, the plaintiff must demonstrate that the harassment was "sufficiently severe or pervasive enough to alter the conditions of plaintiff['s] employment and create an abusive working environment." *Alhalabi v. Mo. Dep't of Natural Res.*, 300 S.W.3d 518, 527 (Mo. Ct. App. 2009). Although an employee is not required to prove a specific, discrete, adverse employment action in order to establish a claim of hostile work environment, the employer's conduct "must be sufficient to create a hostile work environment, both as viewed subjectively by the plaintiff and as viewed by a reasonable person." *Fuchs v. Dep't of Revenue*, 447 S.W.3d 727, 2014 WL 4192757 at *5 (Mo. Ct. App. 2014). And to make a submissible claim for retaliatory discharge under the MHRA, a plaintiff must establish that (1) the defendant terminated his employment, (2) his protected activity was a contributing factor in the termination, and (3) he sustained damage as a direct result of the conduct; "generally more than a temporal

connection between protected activity and an adverse employment action is required to show a genuine factual issue on retaliation exists." *Williams*, 281 S.W.3d at 866, 869.

Although the standards and analytic framework are somewhat different, the Court concludes that Defendant is entitled to summary judgment on Plaintiff's MHRA discrimination and harassment claims for essentially the same reasons it is entitled to summary judgment on these claims under Title VII. Defendant has failed to raise a factual question on whether race was a contributing factor in his pay raises, and on whether Schmidt's comments created a hostile work environment for Plaintiff. The Court concludes that Plaintiff's retaliation claim under the MHRA also fails at this point in the proceedings, because Plaintiff has failed to show a genuine factual issue to support his assertion that his protected activity was a contributing factor in his termination.[6] *See, e.g., Evans v. Hardee's Food Sys., Inc.*, No. 4:12CV01675 ERW, 2013 WL 6732105, at *9 (E.D. Mo. Dec. 19, 2013).

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's motion for summary judgment is **GRANTED** on all claims. (Doc. No. 98.)

---

[6] The Court rejects Defendant's argument that Plaintiff abandoned his MHRA retaliation claim.

A separate Judgment shall accompany this Memorandum and Order.

_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 22nd day of January, 2015.